| | |
|---|---|
| ANGELA SCHAEFER,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>BIOLIFE PLASMA L.L.C.,<br><br>　　　　　　　　Defendant. | Civil No. 11-3468 (JRT/LIB)<br><br>**MEMORANDUM OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT** |

Arlo H. Vande Vegte, **ARLO H. VANDE VEGTE, P.A.**, 12800 Industrial Park Boulevard, Suite 210, Plymouth, MN 55441, for plaintiff.

Timothy M. Threadgill, **BUTLER SNOW O'MARA STEVENS & CANNADA PLLC**, Post Office Box 6010, Ridgeland, MS 39158, for defendant.

Plaintiff, Angela Schaefer, was employed by defendant, BioLife Plasma L.L.C. ("BioLife") before being terminated in December 2010 for falsifying an injury incident report and making false statements. Schaefer's complaint alleges that BioLife discharged her in retaliation for her application for workers' compensation benefits, in violation of Minn. Stat. § 176.82, subd. 1. BioLife moves for summary judgment, seeking dismissal of Schaefer's sole claim. The Court will deny BioLife's motion for summary judgment because Schaefer has made a prima facie case of retaliatory discharge and produced evidence which creates a genuine issue of material fact regarding whether BioLife's proffered reason for Schaefer's termination was pretextual.

## BACKGROUND

Schaefer worked for BioLife in its St. Cloud, Minnesota, facility as a Senior Plasma Technician from December 2008 to December 2010. (Aff. of Arlo H. Vande Vegte, Ex. 7 (Dep. of Angela Schaefer ("Schaefer Dep."))[1] 9:15-10:1, 63:22-24, Feb. 21, 2013, Docket No. 20.) BioLife terminated Schaefer on December 17, 2010. (*Id.* 63:6-64:11.) BioLife's internal memorandum states that BioLife terminated Schaefer "[d]ue to falsification of a company report record and statement" and explains the reasons for her termination as follows:

> Angela alleged [injuries] from a slip in the parking lot while walking to her car after work. The company video surveillance shows Angela did not slip or fall on her trips out to her car and holds a cell phone in her left hand up to her ear. Angela falsified an incident report and made false statements. The company video surveillance proved there was no slip and no injury occurred.

(Aff. of Alison Tasma Vance, Ex. 1 (Dep. of Angela Schaefer),[2] Ex. 11 (Employee Conference Memorandum), Jan. 31, 2013, Docket No. 14.)

*Underlying Events*

On November 30, 2010, Schaefer went outside during her second break of the day, at approximately 5:00 p.m. (Schaefer Dep. 20:17-25.) During this second break, Schaefer made two trips from the BioLife building to her car in the employee parking lot.

---

[1] The Deposition of Angela Schaefer attached as an exhibit to Vande Vegte's affidavit includes the complete deposition transcript. All cites to Schaefer's deposition – except to the deposition's exhibits – are to the Exhibit 7 of Vande Vegte's affidavit.

[2] The Deposition of Angela Schaefer attached as an exhibit to Vance's affidavit includes only excerpts of Schaefer's deposition testimony but includes Deposition Exhibits 4, 5, 6, 9, 10, 11, and 17. All cites to the exhibits of Schaefer's deposition are to Exhibit 1 of Vance's affidavit.

(*See id.* 98:22-99:25.) When Schaefer came back inside at the end of her break, she told her supervisor Alison Manderscheid that she had slipped and almost fallen outside. (*Id.* 19:18-20, 20:23-24:4.)

Schaefer alleges that this was the second time that she had slipped in the BioLife parking lot that day. (*See id.* 21:10-22.) The parties dispute whether Schaefer had previously told Manderscheid that she had also slipped during her first break, taken around 3:00 p.m. Schaefer testified that she was "not sure" if she told Manderscheid that she slipped during her first break but thought that she "probably did." (*Id.* 26:11-16; *see also id.* 21:8-11 ("In passing I do believe I told Alison the very first time . . . .").) In a written report dated December 16, 2010, Manderscheid wrote that when Schaefer returned from her 3:00 p.m. break Schaefer "did not say anything about any issues on break." (Vande Vegte Aff., Ex. 5 (Dep. of Alison Manderscheid ("Manderscheid Dep.")) 12:5-12, 14:4-6, Docket No. 20.)

After Schaefer informed Manderscheid of the slip that occurred in the parking lot around 5:00 p.m., Manderscheid said that she would have another employee go out and put down some salt. (Schaefer Dep. 23:3-9.) Meanwhile, Schaefer told BioLife's nurse on duty, Sarah Terres, that she was hurt. (*Id.* 23:12-13.) Terres asked Schaefer questions about the slip, and Terres used the information provided by Schaefer to fill out an "Incident Report Worksheet." (*Id.* 28:6-22 & Ex. 5.) The form lists the "Time of Incident" as "5 p.m." and the location as "parking lot/outside back door." (*Id.*, Ex. 5.) Under the injury description, Torres wrote "Angela walked out back door into parking lot for break today + slipped x2 did not fall to ground, causing pain in neck, shoulder +

L side." (*Id.*) In the "Employee's Statement box" Schaefer wrote "walked out the back door/employee door + caught myself from slipping on ice 2x. I felt instant tension in my neck + Left shoulder + lower back." (*Id.*) Schaefer signed the form above a statement that provided: "I certify that all statements are true and accurate. Falsifying information may lead to disciplinary actions up to and including termination." (*Id.*)

*BioLife's Investigation*

The following morning, December 1, 2010, Manderscheid told Inga Anderson, her supervisor and the St. Cloud Center Manager, what had happened. (Manderscheid Dep. at 15:23-25; Vande Vegte Aff., Ex. 3 (Dep. of Inga Anderson ("Anderson Dep.")) 4:13-14, Docket No. 20.) That same morning, Anderson reviewed the Incident Report completed by Terres. (Anderson Dep. at 12-23.) Before Schaefer arrived at work, Anderson accessed and reviewed the security camera footage from the previous evening. (*See id.* 55:5-9 & Ex. 6.) Anderson later saved the video footage from the time surrounding Schaefer's 5:00 p.m. break, but she did not save footage from Schaefer's 3:00 p.m. break. (*See id.* 73:25-74:2, 107:17-20 & Ex. 17.) The security camera footage does not encompass the entire parking lot. (*See* Schaefer Dep. 98:18-22.)

After Schaefer arrived at work on December 1,[3] Schaefer and Anderson spoke about the slip. (*Id.* 31:15-22; Anderson Dep. 62:22-63:7.) Schaefer explained to

---

[3] Before reporting to work on December 1, 2010, Schaefer visited an occupational medicine physician. (Schaefer Dep. at 31:12-14.) Schaefer saw Philip J. Bachman, M.D., complaining of neck, shoulder, and back pain. (Vande Vegte Aff. Ex. 4, Dep. of Philip J. Bachman 72-21, Docket No. 20.) Schaefer told Bachman that she had twice slipped on some ice outside of work the day before. (*See id.* 7:25-13 ("There were actually two incidents.").)

(Footnote continued on next page.)

Anderson what had happened. (Schaefer Dep. 31:23-32:1.) Anderson then asked Schaefer to go outside with her and show her where the slips had happened. (*Id.* 32:2-11.) Schaefer pointed out where she had slipped, and both Schaefer and Anderson took pictures of the areas where the slips had occurred.[4] (*Id.* 32:16-20; *see also* Anderson Dep. 65:14-16, 78:23-79:13.) Schaefer testified that during this conversation she told Anderson that she had slipped once on each of her breaks the day before (Schaefer Dep. 33:5-7); Schaefer then stated, "I'm not sure if I specified both slips or not. . . . When I talked to [Anderson], I just let her know that I had slipped." (*Id.* 34:9-13.) Anderson testified that Schaefer did not tell her she had slipped during both her first and second breaks. (Anderson Dep. 69:6-16). Anderson also testified that Schaefer told her that "she just went out and came right back in after grabbing a shake" but that Schaefer also told her she "wasn't carrying anything." (*Id.* 70:22-24.)

Anderson documented her conversation with Schaefer on a "Root Cause Analysis Worksheet for Supervisors." (*Id.*, Ex. 8.) Anderson wrote:

_____

(Footnote continued.)

Bachman testified that Schaefer's injuries were consistent with the slipping that she described. (*Id.* 10:8-14.) Schaefer did not report any prior injuries to Bachman (*id.* 24:3-11) but Bachman did state that the "way [Schaefer] describes the mechanics of the injury as she presented them to me could aggravate a preexisting disorder" (*id.* 25:22-24). No one from BioLife contacted him to determine whether Schaefer's mechanism of injury was consistent with her symptoms. (*Id.* 20:20-21:7.)

[4] Anderson later saved the security video from the time that she and Schaefer were outside. (*See* Anderson Dep. 64:15-24.) Anderson testified that at one point during the video, Schaefer points to the spot where she slipped. (*Id.* 67:1-10.) Schaefer testified that where she slipped was outside the view of the camera. (Schaefer Dep. at 98:20-21.) The video does not include footage of either Anderson or Schaefer taking photographs. (Anderson Dep. 75:23-76:12.)

> Employee states she walked out to her car. She wasn't walking fast, paying attention. Not doing anything else. The fall occurred outside the garage door in the back. On the way outside slipped closer to the building, then on way back went further out by the divider + slipped again on ice. Both times did not fall completely[.] Wasn't carrying anything. Wearing work shoes that she normally wears. Does not wear different shoes when …. [text cut off of exhibit.] . . . Starting to get dark. She thinks the light was on. Went out to get her food to eat (+ a shake to drink). Went right out and came back.

(*Id.*; *see also* Anderson Dep. 96:18-97:8.)

On the afternoon of December 1, 2010, Anderson sent an e-mail (*id.*, Ex. 6) to Sherrie Stevenson, a BioLife employee specializing in employee health and safety (Anderson Dep. 29:2-13), and Nancy Engelmann, a BioLife employee in the corporate human resources department (*id.* 28:10-14). The e-mail stated that Schaefer's fall "occurred within our video camera view." (*Id.*, Ex. 6.) The e-mail noted inconsistencies in Schaefer's description of events, including that Schaefer "said she wasn't doing anything when walking out to the car" but "on her second trip to the car she was holding a cell phone with her left arm (the shoulder that was reported injured)." (*Id.*)

On December 2 and 3, Anderson continued to correspond with Stevenson and Engelmann as well as other BioLife employees. (*Id.*) On December 2, Anderson sent an e-mail to Stevenson and Englemann giving a "Timeline from this morning." (*Id.*) The e-mail includes the following:

> 740A [Schaefer] told Katy her hand was numb and then went on her 20 min break.
>
> 800A Called the Occ health doctor
>
> 809A We received the Injury-Report to Employer with 'Rotate job between reception & intake' added to the bottom of yesterday's note. Angela did not return to the production area, but worked on reading & test taking for her Annual review

> 845A [Schaefer] left to the Occ Health Clinic
>
> 1010A [Schaefer] returned to center with the second Dr note adding '4 hrs/day max'
>
> When she returned, I told her she could punch in for the rest of her shift & she said her doctor told her that she was done for the day. I stated that it was not on the note & she should finish her shift. She then said she would work an hour because she would then have reached her 4 hours. I told her that she was not doing these duties, so she should be able to complete another 2 hours of 'reception & intake' duties. She said that she would call her doctor again to clarify. I told her I would send to EHS & we could speak directly with the doctor & told her we would her schedule to determine what works for us . . .
>
> I am going to get the video recorded today. Have to get the appropriate CD to copy it.

(*Id.*) On December 3, Anderson forwarded the pictures taken by Schaefer and herself. (*See id.*)

### *Denial of Benefits*

On December 14, 2010, Broadspire Services, Inc. denied Schaefer's workers' compensation claim. (Schaefer Dep. 62:15-22 & Ex. 10.) The determination form states:

> The employee alleges a left shoulder, neck, and back injury from a slip in the parking lot while walking to her car after work. The employer premises is under video surveillance which shows that the employee did not slip or fall on her two trips out to her car on the alleged date of injury, and constantly holds a cell phone in her left hand up to her ear.[5] There is no indication that any injury occurred. . . .

---

[5] During her deposition, Anderson noted that Schaefer only held a cell phone to her ear during one of her two trips to her car taken during her 5:00 p.m. break. (*Id.* 131:11-14.)

(*Id.*, Ex. 10.) Both Schaefer and BioLife received notice of the denial. (Schaefer Dep. 62:20-21; *see* Anderson Dep. 128:18.) Anderson was informed that Schaefer's workers' compensation claim had been denied. (Anderson Dep. 128:18.)

*Termination of Schaefer*

On December 16, 2010, Anderson again met with Schaefer, and they reviewed the video footage from Schaefer's 5:00 p.m. break on November 30. (*See* Schaefer Dep. 49:21-50:4; Anderson Dep. 103:14-104:9.) Anderson confronted Schaefer with the discrepancy between the video footage and Schaefer's description of the events, as understood by Anderson. (*See* Anderson Dep. 104:6-105:2.) Schaefer states that she repeatedly asked to also see video from her 3:00 p.m. break. (Schaefer Dep. 50:3-9.) Schaefer also testified that the area captured by the video did not include the place(s) she slipped[6] and that the video was "choppy" and "not a good tape." (*Id.* 51:2-15.) Either during or immediately after her meeting with Schaefer, Anderson drafted a document summarizing her meeting with Schafer. (Anderson Dep. 100:21-101:4 & Ex. 10.) An excerpt of that document is shown below:

> " ~~on 10 TIMELINE~~ as stated on 1-10-10.
> Worked 1-C
>                    -Think @ 3PM
> Went out to 1st break ✓(20 min) slipped. ~~Could be~~   JMA 12-16-10
> ~~beyond what video showed.~~ JMA 12-16-10.
> That was in that area.

---

[6] It is unclear from Schaefer's testimony if she slipped twice in the same place or in two different places.

- 8 -

(*Id.*, Ex. 10.) Anderson testified that she "didn't know" why she had crossed out "Could be beyond what the video showed." (*Id.* 106:24-107:7.)

Also on or about December 16, Anderson asked Terres and Manderscheid to write out a statement of the events on November 30. (*See* Manderscheid Dep. 12:5-12; Anderson Dep. 114:2-13, 118:7-15.) Both women handwrote and signed statements on December 16. (Anderson Dep. 114:2-13, 118:7-15 & Exs. 11, 12.) Manderscheid's statement says that Schaefer "did not say anything about any issues" after returning from her first break but had told Manderscheid after her second break that she "almost slipped twice." (*Id.*, Ex. 11.) Torres' statement states that Schaefer had told her around 6:00 p.m. "that she had slipped on the ice in the parking lot during her break." (*Id.*, Ex. 12.)

Sometime on December 16, Anderson discussed the meeting and the "results of [BioLife's] investigation" with Engelmann. (Anderson Dep. 120:10-24, 122:22-123:3; *see also id.* 105:16-106:12.) Anderson states that sometime on December 16, because of a "culmination of all the conversations," she had concluded that Schaefer should be terminated. (*Id.* 121:23-122:6.)

On December 17, 2010, Anderson met with Schaefer to inform her she was being terminated. (Schaefer Dep. 63:22-64:11.) Schaefer asked to see the video of her 5:00 p.m. break again and repeated her request to see the video from her earlier break. (*See id.* 64:12-24.) During the meeting Anderson and Schaefer discussed the Employee Conference Memorandum quoted above. (Anderson Dep. 129:22-25 & Ex. 14.) Schaefer refused to sign the Employee Conference Memorandum. (Schaefer Dep. 64:14-15.)

Schaefer brings a claim for retaliatory discharge,[7] pursuant to Minn. Stat. § 176.82, subd. 1, arguing that BioLife fired her not because she falsified her incident report form but rather "for seeking workers['] compensation benefits." (Notice of Removal, Ex. 1 ("Compl.") ¶ 8, Nov. 29, 2011, Docket No. 1.) BioLife moves for summary judgment.

## ANALYSIS

**I. SUMMARY JUDGMENT STANDARD OF REVIEW**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[7] Schaefer originally brought her case in Stearns County, but BioLife removed to this Court. (Notice of Removal, Nov. 29, 2011, Docket No. 1.) The Court has diversity jurisdiction. 28 U.S.C. § 1332.

## II. SCHAEFER'S RETALIATORY DISCHARGE CLAIM

### A. Standard of Review

Minnesota Statutes § 176.82 provides that "[a]ny person discharging . . . an employee for seeking workers' compensation benefits . . . is liable in a civil action for damages incurred by the employee." Minn. Stat. § 176.82, subd. 1. Minnesota courts usually apply the *McDonnell Douglas* three-part burden-shifting analysis to retaliatory discharge claims under § 176.82.[8] *Miller v. CertainTeed Corp.*, 971 F.2d 167, 171 (8th Cir. 1992); *Snesrud v. Instant Web, Inc.*, 484 N.W.2d 423, 428 (Minn. Ct. App. 1992). To satisfy the three-part *McDonnell Douglas* test and make a prima facie case of retaliatory discharge under Minnesota law, first, the employee must establish: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two. *Dietrich v. Canadian Pac., Ltd.*, 536 N.W.2d 319, 327 (Minn. 1995). Second, if the employee establishes her prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the employee's discharge. *Schmitz v. U.S. Steel Corp.*, 831 N.W.2d 656, 670 (Minn. Ct. App. 2013). Third, if the employer articulates a legitimate non-retaliatory reason, the employee then bears the burden of demonstrating "that the

---

[8] Alternatively, a plaintiff may present direct evidence of retaliation. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011). Schaefer claims that she presents direct evidence of retaliation because BioLife's termination of Schaefer was related to her claim that she was injured. But Schaefer does not present any direct evidence that she was terminated because of her workers' compensation claim. Rather the evidence she identifies (for example the Employee Conference Memorandum) states that she was terminated because she falsified a company report, that is, the incident report.

employer's stated reason for its action was more likely than not pretextual." *Id.* at 670-71; *see also Sigurdson v. Isanti Cnty.*, 386 N.W.2d 715, 720 (Minn. 1986).

### B. Schaefer's Prima Facie Case

BioLife admits for the purposes of this motion that Schaefer can establish the first two prongs of her prima facie case. Schaefer must, therefore, establish a causal connection between her request for workers' compensation – the statutorily protected conduct – and her termination – the adverse employment action.

First, BioLife admits that it discharged Schaefer because she falsified a form reporting her injury. The allegedly false conduct underlying Schaefer's incident report, reporting an injury, was the same alleged conduct underlying the request for workers' compensation. The close link between the report of the injury, the request for compensation, and Schaefer's termination satisfies the causal connection.

In addition, the timing between the protected activity and the adverse employment action is close, supporting an inference of causation. For example, in *Smith v. Allen Health Systems, Inc.*, the court held that two weeks' proximity between the protected conduct and discharge was "sufficient" to establish causation. 302 F.3d 827, 833 (8th Cir. 2002) ("This holding is consistent with the overarching philosophy of the *McDonnell Douglas* system of proof, which requires only a minimal showing before requiring the employer to explain its actions."); *see also Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1022 (8th Cir. 2011); *Rouse v. Farmers State Bank of Jewell, Iowa*, 866 F. Supp. 1191, 1205-06 (N.D. Iowa 1994) (collecting cases where temporal proximity was held to be sufficient). The Court finds that Schaefer satisfied the burden of establishing her prima facie case at

this summary judgment stage because the causal connection is established not only by the close relationship between the report of Schaefer's injury and her termination but also by the temporal proximity between Schaefer's workers' compensation claim and her discharge.

### C. BioLife's Non-Retaliatory Reason and Pretext

BioLife articulates a legitimate, non-retaliatory reason for Schaefer's discharge: the falsification of a company report and statement. *See, e.g.*, *Randall v. N. Milk Prods., Inc.*, 519 N.W.2d 456, 459-60 (Minn. Ct. App. 1994) ("Randall may properly be discharged for dishonest behavior, for instance for filing a false workers' compensation claim."). Schaefer thus bears the burden of demonstrating that BioLife's stated reason was more likely than not pretextual.

BioLife argues that the honest belief rule should apply to the analysis of retaliatory claims under Minn. Stat. § 176.82. Recently, the Eighth Circuit explicitly noted its use of the honest belief rule, noting that the "critical inquiry in discrimination cases . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012) (internal quotation marks omitted). Under the Eighth Circuit's articulation of this rule, an employee "must present sufficient evidence that the employer acted with an intent to discriminate, not merely that the reason stated by the employer was incorrect." *Id.* at 1003. The honest belief rule typically applies, however, only "when the

employer raises a ground for termination unrelated to the protected conduct at issue." *Pye*, 641 F.3d at 1022.

Although the Eighth Circuit has not decided whether the honest belief rule applies to claims brought under Minn. Stat. § 176.82, it has applied the rule to claims for retaliatory discrimination under Title VII. *See, e.g.*, *id.* The Eighth Circuit has also applied the rule in the context of Minnesota Human Rights Act ("MHRA") claims. *See Macias Soto v. Core-Mark Int'l, Inc.*, 521 F.3d 837, 842 (8th Cir. 2008). The Court need not decide whether the rule applies to retaliatory discharge claims under Minn. Stat. § 176.82 to decide this case; even if otherwise applicable, the honest belief rule is inapposite because Biolife's ground for termination – that Schaefer falsified reports of her injury – is "inextricably intertwined" to the protected conduct at issue – filing a workers' compensation claim based on the same injury. *Pye*, 641 F.3d at 1022.

Schaefer must show that BioLife's proffered reason – that Schaefer falsified an incident report and made false statements – was "unworthy of credence." *Sigurdson*, 386 N.W.2d at 720. Schaefer contends that BioLife's reason is unworthy of credence because the investigation supporting BioLife's conclusion that Schaefer falsified the incident report was inadequate, because facts on the record support a conclusion that Schaefer's incident report was not falsified, and because BioLife's claim that the investigation regarding the Schaefer's incident report and injury was independent of her workers' compensation claim is not credible.

Schaefer presented evidence that BioLife could not reasonably believe she falsified the incident report because BioLife's investigation was noticeably incomplete.

In the investigation, the surveillance video was relied on heavily; the Employee Conference Memorandum stated that the "company video surveillance shows Angela did not slip and fall." But the video did not show the entire area and was choppy. Moreover, only the video from the later break was viewed and saved; the video from the earlier break was never considered despite Schaefer's repeated requests to view it. Thus, a reasonable jury could find that the investigation's conclusion that the video surveillance would have shown any fall that occurred was faulty. In addition, as part of its investigation, no one at BioLife ever contacted Schaefer's physician to see if her injuries were consistent with her mechanism of injury.

Schaefer also presented evidence that BioLife's conclusion that she falsified the incident was not credible because the events happened as she reported them in the incident report. Schaefer argues that her accounting of events was consistent and truthful but that Anderson and others at BioLife did not listen to her or consider and preserve the evidence consistent with her story. Viewing the facts in the light most favorable to Schaefer: one of Schaefer's slips could have occurred earlier in the day – and within the view of the security camera – and the second slip could have occurred later in the day – either outside the view of the camera or not captured by the choppy video. Alternatively, both slips could have occurred outside the view of the camera. In addition, the confusion about whether Schaefer was carrying something or not could have been caused by the number of trips that she took – at least one during her first break and two during her second break, each with a different load. Schaefer's recounting of events – that she slipped once during each break – is consistent with the account she provided to Terres

and Mandersheid, as recorded in their statements. Although Terres and Manderscheid do not mention a slip on the earlier break, Schaefer's statements to them are not inconsistent with an earlier slip.

Schaefer further suggests BioLife's reason for her termination was not credible because investigations into her workers' compensation claim were intertwined with the investigation into whether she falsified the incident report. For example, Anderson sent communications to human resources that addressed both the validity of Schaefer's injury claim and Schaefer's requests for modified work and hours due to her injury. Additionally, the reasons for the denial of Schaefer's workers' compensation claim appear to have been based on BioLife's investigation and information provided from BioLife.[9]

The Court notes its concern with employers using falsification of workers' compensation claims – or the injuries underlying them – as a grounds for termination. Minnesota Statutes § 176.82 is intended to prevent employers from using "threats or coercion to discourage or prevent an employee from pursuing a claim for workers' compensation." *Leuer v. Swift-Eckrich, Inc.*, No. C9-88-1925, 1989 WL 12363, at *2 (Minn. Ct. App. Feb. 21, 1989) (internal quotation marks omitted). As the Minnesota

---

[9] For example the compensation denial form states that "[t]he employer premises is under **video surveillance which shows that the employee did not slip or fall** on her two trips out to her car on the alleged date of injury, and **constantly holds a cell phone in her left hand up to her ear**." (Schaefer Dep., Ex. 10 (emphasis added).) The Employee Conference Memorandum states "company **video surveillance shows Angela did not slip or fall** on her trips out to her car and **holds a cell phone in her left hand up to her ear**." (Anderson Dep., Ex. 14 (emphasis added).)

Court of Appeals noted in *Randall*, "dishonesty is not a legitimate reason for terminating employment if this reason is a pretext for discharging the employee in retaliation for seeking workers' compensation benefits." 519 N.W.2d at 460. That court noted the importance of preventing an employer from "subjectively assess[ing] the validity of an employee's workers' compensation claim" and using "self-help as punishment." *Id.* Permitting termination of an employee on the grounds that a flawed investigation demonstrates a reasonable belief of claim falsification provides an employer with the incentive to do a poor investigation. Such a rule would promote the type of "self-help" prohibited by *Randall*, 519 N.W.2d at 460.

Taking all of the facts in the light most favorable to Schaefer, the Court finds that there is a genuine issue of material fact regarding whether BioLife's stated reason for termination, its belief that Schaefer falsified her claim, was unworthy of credence and, therefore, whether BioLife's reason for terminating Schaefer was pretextual. Consequently, the Court will deny BioLife's motion for summary judgment.

This case will be placed on the Court's next available trial calendar.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that BioLife Plasma LLC's Motion for Summary Judgment [Docket No. 11] is **DENIED**.

DATED: September 18, 2013  
at Minneapolis, Minnesota.

                                                    s/ John R. Tunheim  
                                                  JOHN R. TUNHEIM  
                                                United States District Judge